IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:21CR226 |
| | ) | |
| Plaintiff, | ) | JUDGE PAMELA A. BARKER |
| | ) | |
| v. | ) | |
| | ) | |
| DAVIS LU, | ) | GOVERNMENT'S SENTENCING |
| | ) | MEMORANDUM |
| Defendant. | ) | |

Now comes the United States of America, by and through its counsel, David M. Toepfer, United States Attorney; Daniel J. Riedl and Brian S. Deckert, Assistant United States Attorneys; and Candina S. Heath, Senior Counsel, Department of Justice Computer Crime and Intellectual Property Section, and hereby files this Sentencing Memorandum. The United States respectfully requests Davis Lu ("Lu") receive a sentence of imprisonment at the high end of the advisory Guideline Range as calculated in Lu's Final Presentence Report dated August 4, 2025 (R. 118: Final PSR: PageID 2973). The government submits that such a sentence would be sufficient, but not greater than necessary, to provide just punishment for Lu's offense, promote respect for the law, and reflect the seriousness of his conduct. *See* 18 U.S.C.§ 3553(a)(2).

I.     **FACTUAL AND PROCEDURAL BACKGROUND**

A.     **PROCEDURAL HISTORY**

A grand jury indicted Lu on April 1, 2021, with one count of Intentionally Damaging Protected Computers, in violation of 18 U.S.C. §§ 1030(c)(4)(A)(i)(I), (c)(4)(A)(i)(VI) and (c)(4)(B)(i). (R. 1: Indictment, PageID 1). Lu's trial commenced on February 24, 2025. (R. 90: Transcript, PageID 871). The government introduced more than 30 exhibits and solicited the

testimony of witnesses including FBI Special Agent Monica Hantz, FBI Computer Scientist

Joseph Corrigan, Eaton Corporation ("Eaton") IT Architect Matthew Rose, Eaton Platform

Support Administrator James Ferguson, Eaton Enovia Platform Architect Magesh Jayabal, Eaton

Senior Analyst John Matascik, and Eaton IT Cyber Security Specialist Kelly Roe. (R. 92-95:

Transcripts, PageID 1222-2055). Following the government's presentation of evidence, Lu

testified on his own behalf, as a dual fact and opinion witness. (R. 96: Transcript, PageID 2058).

The Government then re-called FBI Special Agent Monica Hantz as a rebuttal witness. (R. 97:

Transcript, PageID 2387). On March 7, 2025, a jury found Lu guilty and returned special

verdicts finding that during a one-year period, "[t]he offense caused damage to ten (10) or more

protected computers," and "[t]he offense caused loss to one or more persons . . . aggregating at

least $5,000 in value." (R. 81: Verdict, PageID 818). Lu filed a motion for new trial, which was

denied. (R. 108: Motion, PageID 2734-56; R. 117: Order, PageID 2939-58). A Presentence

Report was ordered and completed on August 4, 2025. (R. 118: Final PSR, PageID 2959-90).

Sentencing is scheduled for August 21, 2025. (R. N/A: 7/8/2025 Dkt. Entry).

      **B.**      **LU'S CRIMINAL CONDUCT**

Between 2007 and 2019, Lu was a computer programmer with Eaton. (R. 92: Transcript,

PageID 1334-35). As an Eaton employee, Lu wrote and deployed computer code that ran on the

Electrical instance of Enovia, a platform used by a variety of Eaton employees and customers to

store engineering design information and manage the process of making changes to the designs.

(*Id.*, PageID 1314). In or around June 2019, Eaton altered Lu's duties, removing his

responsibility for deploying code to production servers and restricting his access to only

development servers. (R. 93: Transcript, PageID 1604; R. 94: Transcript, PageID 1719-20). After

these changes, Lu was no longer considered a "platform architect" but rather his role was limited

to that of a programmer. (R. 94: Transcript, PageID 1719-20).

Unbeknownst to his employer, Lu also developed multiple pieces of malicious code, which he deployed on Eaton's network. Lu used this malicious code to cause a series of server disruptions in August and September of 2019 in which Eaton's production servers would "hang" or become unresponsive at random intervals. (R. 92: Transcript, PageID 1358-59). From the user's perspective, "the application would simply stop responding. It would still look like their web browser would still be up, they would still see this web page, but any attempt to click any button, run any command, browse anywhere else, run a search, any attempt to do that would simply result in nothing happening at all." (*Id*., PageID 1362). Following Lu's termination on October 4, 2019, the server disruptions ceased but were replaced by an even more serious problem when IsDLEnabledInAD, another instance of malicious code written and deployed by Lu, denied access to all users when Lu's employee ID was removed from the active employee directory. (*Id.*, PageID 1428-32). If Lu's account "is not active on the network, then it will not let anyone into the application. It will send every user . . . it would send them into the landing page before actually authenticating them, which results in them getting redirected back to the login page and no one can log in." (*Id.*). An FBI investigation followed, and agents executed a search warrant at Lu's residence on October 3, 2019. (R. 95: Transcript, PageID 1920-22). Lu was interviewed by Special Agent Hantz on October 7, 2019, and admitted that he wrote two of the pieces of malicious code, ChangLin and emxTemp. (*Id.,* PageID 1923-26). When testifying at trial, Lu admitted that he wrote all of the code presented as malicious by the Government. (R. 96: Transcript, PageID 2093-94, 2103, 2138, 2169).

### C.    LU'S MALWARE

Lu's malware was highly sophisticated, and its deployment was made possible by Lu's unique position of trust within Eaton's network. For many years, Lu was responsible for developing code on the development servers, testing it on the QA servers, and deploying it to

production. (R. 92: Transcript, PageID 1337-38). Lu used his education and experience gained over years of work as an Eaton programmer and troubleshooter to develop malicious code that would hang Eaton's servers in a way that would appear to be the fault of those who had been chosen to take over Lu's deployment responsibilities. By developing his code to run across multiple classes of servers and by introducing randomization into its execution, Lu made the malicious nature of his code exceedingly difficult to detect and troubleshoot.

### 1.    Running Code Across Development, QA and Production Servers

Lu took steps to ensure that his malicious code could not be detected. One of the methods he used was to have his code launch on a development server, generate a file on a QA server, which would send a signal that would hang a production server.

> **A. Magesh Jayabal**: Now, that was very unusual because production servers will be communicating to the production servers. So at the time of crash, seeing the development server in the log file was unusual.
> Q. Once a programmer code is deployed, are the servers supposed to continue to stay in communication at any point, the development, the QA, and the production server?
> **A. Magesh Jayabal**: No. They are different environments.
> Q. And are they supposed to stay separate?
> **A. Magesh Jayabal:** Yes.

(R. 94: Transcript, PageID 1772).

### 2.    Randomization

Another technique used by Lu to thwart detection and hamper remediation was to introduce randomization into his code.

> **A. Magesh Jayabal**: So in the problem we were seeing is it's causing -- the server crashes were happening at random interval of time. So here in this case we are seeing parameters like, you know, sleep for some time, and then, you know, it's starting at some time.
> And then it says waiting for some time, and then it's calling the server here, one of the connection servers, it's trying to connect.
> So it correlates to, you know, some kind of random sleep -- time intervals.
> Q. Did the randomization of this make it more difficult for you to determine what was happening?

4

**A.  Magesh Jayabal:** Yeah.

(R. 94: Transcript, PageID 1783-84).

### 3.      Timed Delays

In addition to the randomization, Lu designed his code to employ a time delay, essentially

acting as a fuse for his malware. As FBI Computer Scientist Joseph Corrigan testified,

"additional functionality as the program was being written would delay -- allow the person

executing the program to delay the program from starting."  (R. 95: Transcript, PageID 2020).

These delays, used in conjunction with triggering the code from his development server, allowed

Lu to force server crashes during times when he was not logged in to his Eaton laptop.

In fact, as Eaton IT Architect Matt Rose put it,

> Q.  So do I have to stay logged into the development server from my laptop in order
>     to keep that session active?
> A.  **Matt Rose:** No. No.
>     I'd go a step further, right.
>     After you've connected to this development server, right, I could, if I had access
>     to a development server, I could connect and I could start a program that counts to
>     a million slowly. And then I could set fire to my Eaton laptop, and the program
>     would -- I would still be logged into that remote server, and that program would
>     still be counting to a million.

(R. 92: Transcript, PageID 1445).

### 4.      IsDLEnabledInAD Malware

Lu enabled the execution of this code regardless of how deployment occurred. Upon Lu's

termination, the company's standard procedure of removing his active directory credentials

triggered the kill switch code[1] Lu had secretly implemented. This code, designed to prevent any

---

[1] A kill switch code is a hidden or intentionally implemented piece of programming designed to remotely disable functionality, delete data, or shut down a system upon a specific trigger. https://amplitude.com/explore/experiment/what-is-a-kill-switch-in-software-development In this case the trigger was that of the login servlet checked the active directory and found that Lu's employee number was no longer active, it would not permit any user to login. (R. 92: Transcript, PageID 1429).

5

unauthorized system login, remained active for up to a year after Lu's departure, effectively locking out all users. (R. 92: Transcript, PageID 1393-98, 1428-33, 1437-39). Lu admitted writing and enabling this code. (R. 96: Transcript, PageID 2126).

### 5. Internet Searches

While Lu's coworkers were trying to troubleshoot what was causing the server crashes, Lu was conducting searches to make his malware more effective and harder to detect. The Government demonstrated that Lu was surreptitiously monitoring his coworkers' efforts to detect the cause of the server crashes, even going so far as to access the website of the Enovia vendor 3DS and searching for the names of his coworkers Jayabal and Ferguson. (R. 95: Transcript, PageID 1943). The evidence also demonstrated that Lu conducted searches for methods to improve his malware. Among many examples presented at trial, Lu searched for "How to remotely kill a process," "How to hide a running process from task manager using Java," and "How to hide your IP address." (*Id.,* PageID 1945, 1945-46, 1947).

### 6. Encrypted Volume

Eaton employee laptops are provided to employees with preinstalled encryption software. As John Matascik testified:

> Q.  Were Eaton employees provided software, their own encryption software approved by Eaton?
> A.  **John Matascik:** Yes.
> Q.  And what was that?
> A.  **John Matascik:**  All of the systems had BitLocker on them.
> Q.  All right. And BitLocker, do you need a username and password to get into it?
> A.  **John Matascik:**  Yes.

(R. 94: Transcript, PageID 1892).

This software was approved by Eaton and ensured that data on Eaton-owned machines was both protected and accessible to the corporation. Lu, however, created an encrypted volume on his Eaton laptop using a different encryption software, VeraCrypt.

> Q. Were Eaton employees supposed to be downloading and installing their own encryption software on their company-issued laptops?
> A. **John Matascik:** No.

(*Id.*, PageID 1893).

By installing and using VeraCrypt, Lu actively bypassed the established system set up by Eaton. He essentially created a "private" space on an Eaton device that was outside the reach of Eaton's own IT and security protocols. This directly violated the implicit trust placed in him to use Eaton's assets responsibly. Despite this, Lu admitted to Special Agent Hantz that he both created and later deleted the encrypted VeraCrypt volume.

> Q:  Did you ask Mr. Lu about an encrypted volume on his laptop?
> A. **Special Agent Hantz:** I did.
> Q. Did he admit that there was an encrypted volume on his laptop?
> A. **Special Agent Hantz:** He did. And he told me he deleted it.

(R. 95: Transcript, PageID 1926).

Although Lu claimed that the volume contained only personal data, the circumstances of Lu's conduct in creating, deleting, and overwriting the deleted data as described below, points to the drive containing incriminating data that Lu sought to hide from his employer and investigators.

### 7.  Cipher Command

After Lu deleted the encrypted volume on his company laptop, in the short time between being ordered to turn in his laptop and arriving at Eaton to do so, Lu ran the Cipher command to ensure that the deleted data could not be recoverable with forensic software. As John Matascik testified:

Q. What was the next thing that you saw?

A.  **John Matascik:** I saw a command called Cipher.

Q. What is Cipher?

A.  **John Matascik:** Cipher's a command that can be used to clear free space on a hard drive.

Q. All right. So what is free space?

A. **John Matascik:** So when you delete a file on a computer, it doesn't actually delete the file. It's still there. But that space where that file was is considered to be free for another file to go later on.
But whatever was there stays there until something else is written over top of it.

Q. All right. Can a forensic tool recover free space?

A. **John Matascik:** Yes, it can, as long as there's not been a file or something else written over top of where that was.

Q. All right. And so what does Cipher do?

A. **John Matascik:**  It writes over top of free space, so it puts data in all the areas of the drive that have had files deleted.

Q. All right. So would it be fair to say it deletes an already-deleted file?

A. **John Matascik:** Yes. It makes it unrecoverable.

(R. 94: Transcript, PageID 1889-90).

### 8. Lu's Failure to Upload Code

The trial evidence demonstrated that after the creation and execution of any of the malicious code, Lu elected not to upload it to the company's code repository site, a decision that further concealed the code and frustrated his colleagues' investigation and remediation efforts. (R. 92: Transcript, PageID 1357, 1396, 1433; R. 93: Transcript, PageID 1500, 1602, 1617; R. 94: Transcript, PageID 1732-34, 1752-53, 1823). Most if not all of the malicious code was found in Lu's possession on his laptop. Witnesses confirmed that the code was in fact malicious in nature, and Lu continued to modify the malicious nature of the code to thwart the investigative efforts of his colleagues. (R. 92: Transcript, PageID 1413-14, 1437-38; R. 93: Transcript, PageID 1473, 1490-95, 1540, 1546, 1571).

### 9. Lu's Perjurious Testimony

Davis Lu was the sole witness for the defense. Lu's testimony was wide-ranging, but the central theme was that the allegedly malicious code served legitimate purposes including

troubleshooting and protecting Eaton's network. (R. 96: Transcript, PageID 2094-97, 2120-23, 2139-40). Lu admitted to executing the Hunshui.java program on specific dates but, while he was aware of the server crashes, he opined that his code did not cause the crashes. (*Id.,* PageID 2242, 2331, 2178, 2250). To support this, Lu claimed that he was not even logged on to the development server at the time the crashes occurred. (*Id.,* PageID 2238-39, 2242-43).

During his testimony, Lu made numerous concessions to the government's evidence. He admitted under oath that he wrote and executed the code. (*Id.*, PageID 2077, 2093-94; R. 97: Transcript, PageID 2310). He conceded that he knew the company's systems were repeatedly crashing in August and September 2019. (R. 97: Transcript, PageID 2299). He confessed to receiving automated system email alerts about the disruptions, albeit disagreeing with the actual number of email alerts received. (*Id.,* PageID 2298).

> **Q.** And, in fact, you knew the servers were hanging, didn't you?
> **A. Davis Lu:** Yeah, I was working on it, yeah.
> **Q.** The question was, though, you knew the servers were hanging, didn't you?
> **A. Davis Lu:** That is correct.
> **Q.** Both because you were getting e-mail alerts, and also because you were talking to your co-workers about it; isn't that right?
> **A. Davis Lu:** That is correct.

(*Id.*, PageID 2299).

Lu testified that he was *not logged into* the development server LOUTCSDENOV3 on August 26, 27, and 29, 2019, the dates reflected in Government case-in-chief Exhibit 6. Exhibit 6 depicted select dates when Lu executed the Hunshui.java program. (Exhibit 40-Slide 59; R. 96: Transcript, PageID 2238-39, 2242-43). Lu admitted to executing the Hunshui.java program on those dates. (R. 96: Transcript, PageID 2242, 2331).

9



Exhibit 40-Slide 59 (Exhibit 6)

To support this claim, Lu disingenuously posited that the sampling of email alerts in Exhibit 13, containing six emails, was the totality of the system disruption alerts he received. Exhibit 13 contained alerts from August 4, 6, 13, 14, and 16, 2019.

Lu further misled the jury by conflating the information contained in Government Exhibits 6 and 13, using Exhibit 40-Slide 61, shown below.

| Gov Exhibit 6 and BATES000024 Date when the programs ran | | | Gov Exhibit 13 System error notification emails | | |
|---|---|---|---|---|---|
| 2019-08-29 | HunShui | | Page 1 | 8/4/2019 8:42:17 AM | ITAR Enovia system |
| 2019-08-27 | HunShui | No Correlation | Page 2 | 8/13/2019 9:43:58 AM | ITAR Enovia system |
| 2019-08-26 | HunShui | | Page 3 | 8/6/2019 5:09:05 AM | Non-ITAR Enovia system |
| 2019-08-25 | Not HunShui program | | Page 4 | 8/14/2019 10:34:32 AM | Non-ITAR Enovia system |
| | | | Page 5 | 8/13/2019 5:58:37 AM | Non-ITAR Enovia system |
| | | | Page 6 | 8/16/2019 11:23:35 AM | Non-ITAR Enovia system |

Gov. Ex. 40_Davis Power Point Pg 61 of 68

Exhibit 40-Slide 61

10

> **A. Davis Lu:** It's clear that when my program ran 27th, 26th, and the 25th, there's no system notification error.
>
> Also when there is a system notification error on 4th, 6th, 13th, 14th, and the 16th, my program did not run.

(R. 96: Transcript, PageID 2243).

Additionally, Lu misrepresented the log data in his testimony, asserting it supported his narrative of *not being logged into* the development server on August 4, 2019, the date the company first noticed the server disruptions:

> **A. Davis Lu:** Yeah, because the issue was that the program must wait on the DENOV3, that particular server for the issue to appear.
>
> And when Eaton first noticed the issue on August 4th of 2019 at 10:00 A.M., I was not on that DENOV3 server.

(*Id.*, PageID 2188-89).

To further the deception, Lu testified about and displayed to the jury Exhibit 40-Slide 57 (shown below).



Exhibit 40-Slide 57

**Q.** And in this particular case, did you have occasion to review any particular server logs relative to the DENOV3 server?

**A. Davis Lu:** Yes. The application log related to me particularly and the targeted PC, the DENOV3.

**Q.** Okay. And is that log reflected here on the slide [Exhibit 40-Slide 57]?

**A. Davis Lu:** That is correct.

(R. 96: Transcript, PageID 2186).

The fourteen entries depicted on Exhibit 40-Slide 57[2] correspond to the locations in the Windows event logs wherein the "LOUTCSDENOV3" server is named. Exhibit 40-Slide 57 depicts logons on August 1, 5, 6, and 7. Lu used this slide and corresponding testimony to support his false narrative that these were the only times he was logged in to this server. To construct this deceptive narrative, Lu deliberately limited his log search query to only entries referencing the server's name. This narrow search yielded just fourteen results, conveniently omitting over 94,900 additional log entries reflecting the server's IP address. This critical omission allowed Lu to utterly mislead the jury, especially since Lu's malicious code was triggered by the IP address, not the server name.

> However, if the request came from DENOV3, *specifically two IP addresses that were associated with DENOV3* at different points in time, then the program -- the IPFilter would erase its list, and then check its list, and then check its list again over and over and over again until all available processes were consumed and the server was no longer responding to more requests from IPFilter or, more importantly, any other request from any user in that affected application server. (Emphasis added).

(R. 93: Transcript, PageID 1476).

Lu's testimony was refuted by the Government's evidence. Multiple witnesses, including Matt Rose, Magesh Jayabal, and Joseph Corrigan testified that various pieces of code Lu wrote were malicious in nature. (R. 92: Transcript, PageID 1413-14, 1437; R. 93: Transcript, PageID

---

[2] Exhibit 40-Slide 57 contains excerpts from fourteen entries, starting with entry line 940 and ending with entry line 85905.

12

1473, 1490-91; R. 94: Transcript, PageID 1808-09; R. 95: Transcript, PageID 2024-25). Special Agent Monica Hantz testified in rebuttal that there were actually 95,000 Windows event logs linking Lu's Eaton ID to that server between August 1-7, 2019, not fourteen as had been claimed by Lu. (R. 97: Transcript, PageID 2399-401). She explained that Lu's testimony and presentation only showed a narrow search for the server name (LOUTCSDENOV3) within these logs, leading to his misleadingly low count. (*Id.,* PageID 2401-02). Agent Hantz emphasized that a more accurate search by date, as demonstrated in Exhibit 22 for August 2, 3, 4, and 6, would reveal the extent of Lu's activity, directly refuting his implication that he was not logged on to the LOUTCSDENOV3 server on August 4, 2019. (*Id.,* PageID 2402-05). Most importantly, the jury unanimously concluded that Lu's testimony was false by finding Lu intentionally damaged 10 or more protected computers. (R. 81: Verdict, PageID 818). The jury could only have reached this verdict by disbelieving Lu's testimony that his code solely served legitimate business purposes.

**10.** **Damages**

The jury found in a special verdict that, "The offense caused damage to ten (10) or more protected computers during a one (1)-year period;" and "The offense caused loss to one or more persons during a one (1)-year period aggregating at least $5,000 in value. (R. 81: Verdict, PageID 818). While this satisfies the minimum requirement to trigger the enhanced penalties in 18 U.S.C. § 1030(c)(4)(B)(i), the evidence demonstrates that the actual damages were much higher.

Matt Rose testified as to the amount of time spent by Eaton employees to remediate the devastating impact of Lu's code.

13

> **A. Matt Rose:** . . . one [server] would hang, and then within minutes, perhaps two hours, maybe a second one would hang. And if we waited long enough, perhaps a third one. And had we waited long enough, you know, you get the idea. They would generally fail one at a time. Until they were restarted, you know, they would stay hung.

(R. 92: Transcript, PageID 1361-62).

> **A. Matt Rose:** I spent most of August troubleshooting and diagnosing and trying to get to the bottom of this problem.

(*Id*., PageID 1365).

Magesh Jayabal testified that in August and September of 2019, he spent "more than 100 hours" troubleshooting just the "IsDLEnabledInAD" program. (R. 94: Transcript, PageID 1828). The server hangs were not only an IT problem – they directly affected the engineers and other end users at Eaton who used the Enovia platform to do their jobs.

> **A. Matt Rose:** And while it was hung, anyone that was currently working on the server, those unfortunate users, would -- they would not be able to do anything until they restart their Internet Explorer web browser. If they were in the middle of work, they would lose the work they were in the middle of.

(R. 93: Transcript, PageID 1492).

The problems caused by Lu's malware were not solved quickly. Some issues, such as the IsDLEnabledInAD, which was found across Eaton's network, took many months to remediate.

> **A. Matt Rose:** we began what was -- what turned into a very large remediation effort to identify and repair all of those affected programs.
> Q. Describe that, please.
> **A. Matt Rose:** Well, it was a -- it was about 12 to 18 months, I think, to fully remediate every program that was – that was affected.

(*Id.*, PageID 1397).

Rose further testified about the different roles of those tasked to fix the issues and their hourly rate.

> Q.  And can you estimate how many -- and I know this will be a broad estimate, but how many hours were spent remediating and addressing and fixing the code you've described as malicious?
>
> A.  **Matt Rose:** In terms of order of magnitude, we're talking about, you know, hundreds to thousands of hours just to do the remediation. If you're including all of the troubleshooting and root cause work leading up to, you know, starting from August 3rd, certainly we're talking about thousands of hours.

(*Id.*, PageID 1499).

> Q. And then in the broadest sense, can you give us an idea of the costs incurred by Eaton as a result of this malicious code?
>
> A.  **Matt Rose:** Yes.
> I mean, easily $100,000, right. Certainly hundreds of thousands of dollars is certainly likely.

(*Id.*).

As set forth in the presentence report, Eaton's losses totaled $365,838.00.

> Following the internal investigation, Eaton reported that the company sustained a loss of $365,838.00 due to Lu's malicious code. The loss amount was determined based on the total number of employee work hours that were interrupted by the server crash on August 4, 2019, and the hours spent on tracking down and removing the malicious code from the system, which took over a year to complete.

(R. 118: Final PSR, PageID 2964-65).

### D.      PRESENTENCE INVESTIGATION REPORT

On August 4, 2025, the United States Probation Office ("USPO") issued its final PSR.

(R. 118: Final PSR, PageID 2959-90). The USPO calculated Lu's final adjusted offense level to

be 26. (*Id.*, PageID 2967).

| U.S.S.G. § 2B1.1: | | |
|---|---|---|
| Base offense level | 6 | §2B1.1 |
| Loss ($250,000 - $550,000) | + 12 | § 2B1.1(b)(1)(G) |
| Sophisticated means | +2 | § 2B1.1(b)(10)(C) |
| 18 U.S.C. § 1030(a)(5)(A) | +4 | § 2B1.1(a)(5)(A) |
| Abuse of position of trust/specialized skill | +2 | § 3B1.3 |
| Obstruction of Justice | +2 | § 3C1.1 |
| Zero-point offender | -2 | § 4C1.1(a) and (b) |
| **Final Adjusted Offense Level** | **26** | |

15

Lu has no criminal history, resulting in a Criminal History Category of I. Based on an offense level 26 and a criminal history category I, Lu's guideline imprisonment range is 63-78 months. (*Id.*, PageID 2973).

## II.    LAW AND ARGUMENT

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable [United States Sentencing] Guideline range." *Gall v. United States*, 552 U.S. 38, 49 (2007). Appellate courts must review a district court's sentence for procedural and substantive reasonableness. *Id.* at 51. Although the Guidelines are advisory, appellate courts may apply a presumption of reasonableness to a sentence that falls within the Guideline range. *Id.*

### A.    ADVISORY GUIDELINES CALCULATION

The United States does not object to the final presentence report (PSR) issued on August 4, 2025. Consistent with the PSR, the United States believes Lu's total offense level is 26. (R. 118: Final PSR, PageID 2966). As detailed in the Offense Conduct section of the Final PSR, the victim suffered a loss of approximately $365,838. (*Id.*, PageID 2964-65). Lu used sophisticated means to create malicious code and damaged a protected computer in violation of 18 U.S.C. § 1030(a)(5)(A).  (*Id.*, PageID 2962). In committing his crime, Lu abused his position of trust in the victim's company and used a special skill in computer programming. (*Id.*, PageID 2962-63).  Finally, Lu deleted files on his computer knowing that an investigation was in process and took the stand in his own defense and provided false testimony. (*Id.*, PageID 2965). Lu has no criminal history so his offense level is reduced by two levels. (*Id.*, PageID 2967).  The government respectfully submits that these facts sufficiently establish the final offense level of 26.

16

**B.      18 U.S.C. § 3553 SENTENCING FACTORS**

Pursuant to 18 U.S.C. § 3553(a):

The court, in determining the particular sentence to be imposed, shall consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed—
        (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
        (B) to afford adequate deterrence to criminal conduct;
        (C) to protect the public from further crimes of the defendant; and
        (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence, and the sentencing range . . . ;
(5) any pertinent policy statement . . . ;
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. . . .

Several of these factors weigh in favor of the United States' request for a sentence at the high end of Lu's advisory Guidelines.

**1.      Nature and Circumstances of the Offense**

The nature and circumstances of Lu's conduct warrant a sentence at the high end of the guideline range. As detailed above and in the PSR, Lu, motivated by malicious intent and anger towards the victim, utilized his unique access to damage critical systems of his employer. Lu developed malicious code throughout his employment and embedded it in his employer's system, a ticking time bomb that he alone controlled.

Lu developed one piece of malicious code, the "z method," that would kick a user out of the application at random intervals when they accessed a table containing a specific column that provided detailed information about a part. (R. 94; Transcript, PageID 1728-45). The malicious code was implemented whenever a new file collaboration server was added to the system. (*Id.*). Jay Ferguson was assigned to take over duties from Lu and it was his responsibility to stand up

new file collaboration servers. (R. 92: Transcript, PageID 1346-55). Lu's anger due to his responsibilities being shifted to others motivated the creation of this code which only activated when Jay Ferguson implemented something that was previously Lu's responsibility.

Lu developed another piece of malicious code, Hakai, that caused damage by deleting the profile settings of a random user and preventing them from logging into the Enovia application. (R. 94: Transcript, PageID 1810). This code impacted Eaton's systems going back as far as 2017. (*Id.*, PageID 1811). The fact that Lu designed and implemented malicious code into the victim's computer systems long before he designed the code that ultimately led to his termination and prosecution, shows that Lu had premeditation and malice towards the victim.

Lu also designed code that would break the victim's systems if he was ever terminated. Lu designed and seeded the code IsDLEnabledInAD throughout the victim's system. This piece of malicious code would check the victim's directory every time someone logged into the Enovia application to see if Lu's account was still active. (*Id.*, PageID 1815-23). If Lu's account was inactive then the user would not be able to log in. (*Id.*). Following Lu's termination, the victim deactivated Lu's account and this code crippled the victim's system. Lu even encrypted his account number in the code making it impossible to search once the code was compiled. (*Id.*).

Lu was so angry about other employees taking over his job responsibilities, he wrote a piece of malicious code that would block two of Lu's coworkers from being able to access the system. (*Id.*, PageID 1823). The code was designed in a certain way that it could be easily tuned on and off by simply deleting a few characters. (*Id.*, PageID 1824-25).

Finally, Lu created and deployed the malicious code that ultimately led to his termination and prosecution. This code was designed to randomly crash the victim's servers and cause a maximum amount of confusion. The program was designed in such a way that it was impossible

to predict and difficult to track. (*Id.*, PageID 1783-84). Lu initiated his code to correspond with Jay Ferguson's first deployment since taking over the responsibilities from Lu. (R. 93: Transcript, PageID 1609). Lu's anger at being sidelined at work was directed towards those people he felt were not as competent as he and he intended for them to take the blame. Indeed, at trial, Lu's defense was to blame them for the server crashes. The code initiated connections across multiple server environments in an attempt to conceal his actions but was all started from Lu's development server. (R. 94: Transcript, PageID 1779). Lu continued to modify his code and make it more effective all the while his co-workers were trying to track down the issue and correct it.

The variety of malicious code and the time that it took for Lu to develop them demonstrate that his actions were of a person with a long simmering anger and resentment towards the victim. This was a premeditated and detailed attack on the victim's critical computer systems and for these reasons, the nature and circumstances of the offense support a sentence at the high end of the guideline range.

### 2.  History and Characteristics of the Offender

Lu's PSR thoroughly details his characteristics. The United States therefore highlights the following for the Court's consideration in applying the 3553(a) factors.

The government submits that Lu's history and characteristics, specifically, his lack of any mitigating factors, weighs in favor of a sentence at the high end of the advisory Guideline range. Lu does not have any criminal convictions in his past and this fact is accurately captured in the guideline calculation by his placement in criminal history category I.

Lu was born and raised in China and immigrated to the United States in 1999, when he was approximately 30 years old. (R. 118: Final PSR, PageID 2968-69). Lu reported a happy childhood and a normal upbringing. (*Id.*). Lu reported no mental health, physical, or substance

19

abuse issues. (*Id.*, PageID 2969-70). Lu reported no financial stressors or anything else that would motivate him to commit this crime. In short, there are no typical excuses or reasons behind Lu's behavior in this case. Lu was not driven by an addiction or a behavioral abnormality or past abuse that is typically present in criminal defendants. Lu has no excuse for his conduct beyond his own hubris. Indeed, Lu has chosen not to include a statement detailing an acceptance of responsibility in which he could explain to this Court a justification for his actions.

Following his termination from Eaton, Lu was hired as a programmer by Oceaneering in Texas. However, during the almost four years that he worked for them, he never informed them of his pending criminal charges. More tellingly, when confronted with the need for an extended absence so that he could attend his own criminal trial, Lu fabricated a story about travelling to China to care for his ailing father. Oceaneering found out about the trial and Lu's whereabout from news reports following his conviction. Lu has demonstrated that he still continues to engage in deceit when it comes to dealings with whoever might employ him.

There is nothing in Lu's history and characteristics that would mitigate or explain his behavior, and, in the absence of such information, this Court is left with only the actions of an angry and bitter defendant. Lu's history and characteristics support a sentence at the high end of the guideline range.

### 3. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment.

In this matter, a sentence at the high end of the guideline range would achieve the purposes of sentencing as required and set forth in 18 U.S.C. §§ 3553(a)(2)(A)-(D). As detailed above, Lu's conduct was serious and affected the victim and its employees greatly. Due to Lu's actions, the victim's critical systems were offline and interrupted throughout the month of August 2019. (R. 93: Transcript, PageID 1492-95). During that time, engineers lost valuable

work that they were in the middle of drafting. (*Id.*). Manufacturers lost access to the drawings that they needed to make parts for customers and shipments were delayed. (*Id.*). The victim lost hundreds of thousands of dollars and devoted a significant number of personnel hours to identify, remediate, and rectify the problem. (*Id.*, PageID 1494-99). Additionally, due to Lu's malicious code, the victim spent 12-18 months remediating its systems to identify every potential program that was impacted by his IsDLEnabledInAD code. (R. 92: Transcript, PageID 1397).

A sentence at the high end of the guideline range would promote respect for the law because it would recognize that the victim is not a nameless and faceless organization that is less deserving of protection in the criminal justice system. The victim was comprised of individuals like Matt Rose, an employee that considered Lu a friend. (*Id.*, PageID 1391). Rose and Lu worked together over 10 years on the Enovia application and Lu betrayed Rose's trust with his actions. (*Id.*). Other employees at Eaton such as Magesh Jayabal and Jay Ferguson were set up by Lu to be blamed for the server crashes. (R. 92: Transcript PageID 1280-81; R. 96: Transcript, PageID 2134-35). Employees like Tommy Waddell and Jake Young were targeted specifically by Lu, who wrote malicious code that would lock them and only them out of the system. (R. 94: Transcript, PageID 1823).

Finally, Lu's conduct while the victim was investigating the source of the server crashes led in part to the application of § 3C1.1 for obstructing justice. (R. 118: Final PSR, PageID 2966). A sentence at the high end of the guidelines would also promote respect for the law by punishing Lu for this behavior. Lu's internet search history revealed that he was searching for ways to improve his malicious code, hide his actions from the victim, and delete data from his computer. (R. 93: Transcript, PageID 1665-71). Indeed, when the victim asked Lu to turn in his

21

laptop, Lu overwrote the free space on his computer and made his deleted data unrecoverable. (R. 94: Transcript, PageID 1889-91).

A sentence at the high end of his advisory Guidelines would reflect the seriousness of his conduct and provide just punishment.

III. **GOVERNMENT'S RESPONSE TO (1) DEFENDANT DAVIS LU'S OBJECTIONS TO THE PRE-SENTENCE INVESTIGATION REPORT AND (2) DEFENDANT DAVIS LU'S RESPONSE TO THE GOVERNMENT'S OBJECTIONS TO PRE-SENTENCE INVESTIGATION REPORT**

Or about July 21, 2025, and July 25, 2025, respectively, the defense produced its Objections to the Pre-Sentence Investigation Report ("Lu's PSR Objections") and its Response to Government's Objections to the Pre-Sentence Investigation Report ("Response to Government's PSR Objections"). In Lu's PSR Objections, Lu opposed the adjustment for sophisticated means and the 1030(a)(5)(A) enhancement, claiming double-counting and cumulative effect.

A. **LU USED SOPHISTICATED MEANS TO COMMIT THE OFFENSE**

U.S.S.G. § 2B1.1(b)(10)(C) provides for a 2-level increase for offenses involving "sophisticated means" intentionally executed by a defendant. This enhancement applies when methods of execution or concealment are unusually complex, reflecting heightened planning and culpability. Lu's digital sabotage, leveraging his extensive expertise and access, and involving deliberate concealment and destruction of evidence, unequivocally supports this adjustment.

Lu's background directly illustrates the sophisticated nature of his crime: holding both a bachelor's and a master's degree in computer science and serving for 22 years as an IT Specialist with Eaton. Trial testimony from Lu's colleagues underscored his extraordinary aptitude, describing him as highly talented in both writing code and adeptly resolving complex operational

22

issues related to it. His education, training, and experience provided him with unparalleled knowledge. Lu's expertise allowed him to:

a)      Write and deploy multi-layered, embedded malware: Lu's attack was not a simple action, but involved multiple insidious pieces of malicious code, some cunningly concealed within legitimate code and others standalone, the creation and deployment of which required deep understanding of system architecture to evade initial detection and forensic analysis.

b)      Write and execute a targeted "kill switch:" His creation of the "kill switch" known as IsDLEnabledInAD, which was designed for maximum disruption of multiple programs upon his termination, demonstrated advanced tactical foresight. It relied on a persistent network presence and incorporated precise trigger mechanisms that were built for stealth and a devastating impact.

c)      Actively impede remediation efforts: Lu's internet searches and the multiple versions of his malware revealed that he researched and tweaked his malware to resist his former colleagues' investigative and remediation efforts. This adaptive, ongoing strategy against trained professionals showcases sophisticated, real-time command-and-control, far beyond typical creation or deployment of code, and simultaneous efforts to obscure his involvement.

d)      Attempt to conceal attribution and destroy evidence: Crucially, Lu made deliberate efforts to create misattribution and destroy incriminating data. This includes implementing delay mechanisms in his code, obfuscating certain identifying strings of code, or running a cipher command on his work laptop immediately before its surrender. Such calculated actions, especially efforts to thwart detection and forensic analysis, are hallmarks of sophisticated means.

23

The malware's significant, widespread disruption impacting Eaton's global users over many months further underscores its inherent sophistication. Lu's ability to maintain such protracted chaos and then testify as an expert in his own criminal trial further affirms his exceptional technical knowledge and the deliberate, intricate nature of his methods.

Lu's objection seems to rely on the assumption that all computer fraud offenders must have engaged in sophisticated means to commit the offense. Lu's contention is flawed because the "sophisticated means" enhancement is not a standard element of computer fraud offenses. The enhancement is a specific upward adjustment for a crime that involves "especially complex or intricate offense conduct." While some computer crimes can be simple (e.g., a basic deletion of files or exfiltration of data), Lu's conduct involved a premeditated and intricate scheme, committed over an extended period of time, with multiple types and layers of malware, including a "kill switch," and the intentional destruction of data to impair recovery. The adjustment, therefore, punishes the methods used by Lu to commit and conceal the offense, not the offense itself.

Lu cites three cases purporting to support his opposition to the sophisticated means enhancement. Lu's reliance on these cases is misplaced.

*United States v. Bunke*, No. 3:08 CR 65-1, 2009 WL 650287, at *6 (N.D. Ohio Mar. 11, 2009): The Bunke opinion is not persuasive. The underlying offenses of conviction and sentencing adjustments were incongruous. The defendant in the Bunke case was convicted under 18 U.S.C. § 242 for depriving a prison inmate of his rights under color of law, and it was the "under the color of law" adjustment which was contested. The court actually rejected Bunke's double counting argument. Bunke's situation cannot be compared to Lu's conviction under 18 U.S.C. § 1030 and the application of a sophisticated means adjustment.

*United States v. Michaud*, No. CR. 21-0666 JB, 2024 WL 51173, at *20 (D.N.M. Jan. 4, 2024): Lu misunderstands the legal contest in the *Michaud* case. The core legal issue in *Michaud* was the causation analysis for determining restitution under the Mandatory Victims Restitution Act (MVRA) (18 U.S.C. §§ 3663 and 3663A). The court in *Michaud* was deciding how broadly a defendant's conduct could be linked to a victim's harm for the purpose of ordering restitution. In *Michaud*, the mention of "more sophisticated crimes that do not 'involve[ ] as an element a scheme, conspiracy or pattern or criminal activity'" was a descriptive observation about the nature of certain offenses, such as unauthorized computer access. (*Id.*) It was not a legal finding that such a crime automatically triggered a "sophisticated means" sentencing enhancement.

*United States v. Faibish*, 12-CR-265 (ENV), 2015 WL 4637013, at *4 (E.D.N.Y. Aug. 3, 2015): While the district court in *Faibish* declined to apply the sophisticated means adjustment, its reasoning and rationale were case specific. Faibish was convicted of financial fraud involving a check-kiting scheme to defraud a bank and inflate a company's sales. The district court emphasized the examples of sophisticated means provided in the U.S.S.G. comments, specifically "'[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts.' U.S.S.G. § 2B1.1, cmt. (9)(B)." (*Id.*) Unlike the *Faibish* Memorandum & Order, which contains no mention of such actions, the trial testimony in Lu's case showed a clear pattern of concealing criminal conduct, thwarting detection, and impairing remediation efforts—and wholly justify a sophisticated means adjustment.

The Sixth Circuit has not specifically addressed a challenge to the application of a sophisticated means adjustment in a violation of an 18 U.S.C. § 1030(a)(5)(A) conviction. However, there is ample case law upholding the application of a sophisticated means adjustment

25

when such conduct was distinct from the elements of the offense or the application of other sentencing enhancements. *United States v. Crosgrove*, 637 F.3d 646, 667 (6th Cir. 2011) (upheld when defendant created fictitious insurance certificates during a scheme to commit insurance fraud); *United States v. Simmerman*, 850 F.3d 829, 833 (6th Cir. 2017) (upheld when defendant concealed the fraud using fictitious identification numbers and dormant accounts); *United States v. Phelps*, 2021 WL 4315947, at *6 (6th Cir. Sept. 23, 2021) (upheld when defendants used fictitious bank documents and websites for a Ponzi scheme); *United States v. Battaglia*, 624 F.3d 348, 351 (6th Cir. 2010) (no problematic double counting arises when "distinct aspects" of the defendant's conduct trigger distinct enhancements); *United States v. Rupp*, 2023 WL 370908, at *5 and 6 (W.D. Mich. Jan. 24, 2023) ("Rupp's sophisticated-means enhancement did not duplicate the three others that the district court applied" in that all were "'distinct aspects' of the defendant's conduct.").

**B.     THE APPLICATION OF U.S.S.G. § 2B1.1(b)(19)(ii) WAS APPROPRIATE**

U.S.S.G. § 2B1.1(b)(19) provides for an upward adjustment in three specific situations, each dependent upon a conviction under 18 U.S.C. § 1030. In Lu's case, the Presentence Report properly applied U.S.S.G. § 2B1.1(b)(19)(ii), increasing Lu's guideline range by 4 levels because his offense of conviction was under 18 U.S.C. § 1030(a)(5)(A). Lu's contention that the 4-level enhancement under USSG 2B1.1(b)(19)(ii) constitutes "impermissible double-counting" is ludicrous because it misunderstands the function of specific offense characteristics in the Guidelines.

USSG 2B1.1 is a broad guideline covering "Theft, Property Destruction, and Fraud." The base offense level within this guideline (e.g., 6 or 7) applies to a generic offense within that category. The enhancement in § 2B1.1(b)(19)(ii) is a specific offense characteristic designed to

26

apply because the defendant was convicted of the particular crime of intentionally damaging protected computers under 18 U.S.C. § 1030(a)(5)(A).

It's not double counting the conviction itself. Instead, it recognizes that committing a crime under this specific computer damage statute warrants an increased penalty beyond the general base offense level for fraud or property destruction. The enhancement penalizes the specific nature and heightened seriousness of damaging protected computers, which is a distinct aspect from the general conduct covered by the base offense level. Accepting Lu's argument would effectively nullify this specific, intended enhancement for computer damage offenses.

While the defense cites three cases in Lu's PSR Objections, none even remotely apply. In fact, only four cases appeared in a Westlaw search conducted for the term "2B1.1(b)(19)(A)(ii)." One case appeared to reference an earlier version of U.S.S.G. § 2B1.1(b)(19) in a footnote, when the section applied to violations of securities law.[3] Another case involved a motion for release pending appeal, and the reference was in passing.[4] A Sixth Circuit case held that the section was not applicable if the offense of conviction was 18 U.S.C. § 371, a conspiracy to commit 18 U.S.C. § 1030(a)(5)(A).[5] Lu's offense of conviction falls squarely within the parameters required to trigger the USSG § 2B1.1(b)(19)(ii) enhancement. And the fourth case was *United States v. Gatrel*, 2023 WL 8866564 (C.D. Cal. Dec. 22, 2023). Gatrel claimed double counting for applying both sophisticated means *and* U.S.S.G. § 2B1.1(b)(19)(A)(ii). The court disagreed with the defendant, and opined:

---

[3] *United States v. Pagartanis*, 2024 WL 2111544, footnote 2, (E.D. NY May 10, 2024).

[4] *United States v Golightley,* 2020 WL 3221027 (D. Kan. June 15, 2020).

[5] *United States v Nicolescu*, 17 F.4th 706, 730-731 (6th Cir. 2021).

A sentencing court should "consider all applicable Guidelines provisions in calculating the guidelines range for an offense." *United States v. Smith*, 719 F.3d 1120, 1123 (9th Cir. 2013) ("In particular, the Sentencing Guidelines contemplate that courts will apply all applicable specific offense characteristics to enhance the base offense level."). The Sentencing Commission expressly indicates when Guidelines provisions are not to be applied cumulatively. *Id.* at 1124. It has made no such indication here, and for good reason. The Sentencing Commission enacted the protected-computers enhancement because of a "heightened showing of intent to cause damage," not to deter sophisticated criminal activity. U.S.S.G. amend. 654 (effective Nov. 1, 2003). It follows that the sophisticated-means enhancement does not increase Gatrel's punishment based on "a kind of harm that has already been fully accounted for" in the protected-computers enhancement. *United States v. Gallegos*, 613 F.3d 1211, 1216 (9th Cir. 2010) (quoting *United States v. Stoterau*, 524 F.3d 988, 1001 (9th Cir. 2008)).

## C.      LU NEVER ACCEPTED RESPONSIBILITY

Lu unequivocally demonstrated a lack of acceptance of responsibility by claiming his code served only legitimate business purposes throughout the proceedings. He denied any malicious intent behind his actions and asserted his code did not cause the system disruptions. This consistent stance, which forced the government to prove every element of his guilt at trial, directly contradicted the criteria for an acceptance of responsibility reduction, which rewards genuine remorse and the conservation of judicial resources.

The Sixth Circuit opinion in *United States v. Angel*, 355 F.3d 462, 476-477 (6th Cir. 2004) illustrates that denying an acceptance of responsibility reduction is not a "trial penalty" or a violation of a defendant's constitutional right to go to trial, but rather a reflection of the purpose of the Guidelines' reduction.

The U.S.S.G. § 3E1.1 is designed to reward defendants who conserve judicial and prosecutorial resources and demonstrate genuine remorse by admitting guilt and taking responsibility for their actions. It's not a right, but a privilege earned by specific conduct.

In Angel's case, the court explicitly noted that he put "the government to its burden of proof at trial by denying the essential factual elements of guilt." (*Id.*). Like Lu, Angel's decision

28

to proceed to trial and deny culpability meant the government had to expend significant resources to prove his guilt. The denial of the reduction simply reflects that Lu did not engage in the conduct (timely admission of guilt, remorse, and saving resources) that the Guideline intends to reward.

Furthermore, like in the *Angel* case, the simultaneous imposition of an obstruction of justice enhancement (U.S.S.G. § 3C1.1) for committing perjury and destroying evidence, further underscores that the denial of the acceptance of responsibility reduction was based on Lu's affirmative obstructive conduct, not merely his exercise of the right to trial. The Guidelines explicitly state that obstruction of justice ordinarily indicates a lack of acceptance of responsibility.

Therefore, Lu's is not being penalized for exercising his right to trial, but as a consequence of his intentional actions—both his decision to deny factual guilt at trial and his egregious obstructive conduct—which are antithetical to the very concept of "acceptance of responsibility" as defined by the U.S.S.G. Lu's constitutional right to a trial does not guarantee a reduction for acceptance of responsibility when his conduct is inconsistent with that acceptance.

Curiously, the defense contends that "Had Mr. Lu not proceeded to trial and instead accepted the attractive plea offer he received," he would have automatically received a 3-level reduction for acceptance of responsibility. (Lu's PSR Objection, page 4). First, the only plea "offered" by the government was for Lu to plead guilty to the indictment, and that "the parties would be free to argue the applicability of sentencing enhancements." Lu could have pleaded guilty to the indictment, with or without any agreement by the government, so there was nothing "attractive" about the offer. The parties did not agree to any specific U.S.S.G. level, and while a 2-level reduction for acceptance of responsibility was mentioned as a possibility, it was not

29

guaranteed. Second, as mentioned in the final PSR, a reduction for acceptance of responsibility (whether for 2 levels or 3) is not an automatic right. (R. 118: Final PSR, PageID 2990).

### D. LU ABUSED A POSITION OF TRUST AND USED A SPECIAL SKILL

The facts and arguments set forth in the attached letter (Exhibit 1) to the USPO, dated July 17, 2025, are incorporated herein for all purposes. This letter was provided to the defense on or about July 22, 2025. It was to this letter that the defense filed its Response to Government's PSR Objections.

## IV. CONCLUSION

For the foregoing reasons, a sentence at the high end of Lu's Guideline range is sufficient, but not greater than necessary, to support the § 3553(a) factors. The United States will be prepared at the sentencing hearing to elaborate on these points, answer the Court's questions, and refute additional arguments from Lu in support of a lesser sentence. But given the information before the Court, the United States recommends that it impose a sentence at the high end of his Guideline range.

Respectfully submitted,

DAVID M. TOEPFER
United States Attorney


By:     /s/ Brian S. Deckert_____
Daniel J. Riedl (OH: 0076798)
Brian S. Deckert (OH: 0071220)
Assistant United States Attorneys
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3669/3873
(216) 685-2378 (facsimile)
Daniel.Riedl@usdoj.gov
Brian.Deckert@usdoj.gov

30

 /s/ Candina S. Heath_____
Candina S. Heath (TX #09347450)
Senior Counsel
U.S. Department of Justice Criminal Division
Computer Crime & Intellectual Property Section
1301 New York Ave. NW, Suite 600
Washington, DC 20530
(202) 923-5211
Email: Candina.Heath2@usdoj.gov

31