**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| United States of America,<br><br>    **v.**<br><br>**Davis Lu,**<br><br>    **Defendant**. | **Case No. 1:21 CR 00226-001 (PAB)** |

## DEFENDANT DAVIS LU'S SENTENCING MEMORANDUM

Davis Lu, by and through counsel, respectfully submits this Memorandum in Aid of Sentencing on his behalf, and requests a downward departure or variance to a below-guidelines sentence.

## I. INTRODUCTION

Mr. Lu stands convicted by a jury of one count of Intentionally Damaging Protected Computers by damaging more than 10 computers and causing a loss of more than $5,000, in violation of 18 U.S.C. §§ 1030(a)(5)(A), (c)(4)(A)(i)(I), (c)(4)(A)(i)(IV), and (c)(4)(B)(i) ("Count One"). The government alleged, and a jury found, that Mr. Lu intentionally damaged the computer servers of his employer by writing and releasing a malicious code, causing multiple computers to repeatedly crash. At trial, Mr. Lu acknowledged writing the code in question, but he maintained that his code was not responsible for the servers repeatedly crashing. While Mr. Lu maintains his innocence, he understands the jury found otherwise and he respects the jury's verdict.

## II. MR. LU'S EARLY LIFE

Mr. Lu was born and raised in Shanghai, China. He grew up under communist rule. The cultural revolution occurred when he was a young child and he witnessed the Youth Red Guard break into his family's home and take away all the valuables. Mr. Lu's grandfather, who had owned

1

property, was forced to walk in the street, wearing a sign identifying him "anti-communism scum" and "capitalism sympathizer."

Because of his family's background, Mr. Lu was bullied as a small child. Fearing for his safety, his parents sent him to a remote area where he lived for the next several years. Food was scarce, as the government prioritized sending food to the urban population, and he was frequently hungry. It was not until after the Cultural Revolution ended that Mr. Lu's living situation steadied and improved.

Mr. Lu excelled at school and enrolled in the computer science department at a top university in China in 1988. Mr. Lu graduated with a bachelor's degree in computer science in 1992, but had difficulties finding a job due to his prior political involvement. Instead, he went to Japan and worked as a software engineer for five years. In 1999, Mr. Lu came to the United States on a work visa. Mr. Lu has been a legal permanent resident in the United States since 2007.

Mr. Lu married his wife, Haiyan, whom he had known since childhood, in 1997. Two years later, in 1999, their daughter was born while they were living in Chicago. Mr. Lu worked in Denver at a company called IntegWare and also continued his education, attending school in the evenings and on weekends, and earned a Master's Degree in computer science.

Mr. Lu worked at a consulting company as a software engineer for the next six years. The job required that Mr. Lu travel every week from Sunday afternoon until Friday afternoon, visiting customer sites. Although Mr. Lu received outstanding performance reviews, the constant travel took a toll on his family life. Eventually, Mr. Lu decided to leave and began work at Eaton Corporation in 2007.

Mr. Lu initially worked at the Eaton office in Moon Township, PA. Over time, the job requirements evolved such that he was able to mostly work from home, and only came into the

office intermittently. Because of health issues his wife suffered from, she had to quit work and Mr. Lu has been the family's sole source of financial support. Mr. Lu consistently worked 50-60 hour weeks at Eaton, and received outstanding performance reviews.[1]

---

[1] Mr. Lu's work was highly valued by fellow colleagues. A sampling of comments from colleagues, including comments via Eaton's eStar records, describe Mr. Lu:

- Rose mentioned that "LU was friendly, quiet, and focused and he certainly had a passion for his work." (288A-CV-3168773_0000034.pdf)

- Eric Huang on August 16, 2019: "Thanks for your strong support on this project. It's a long journey and very complex project - the first Enovia/PDH/SAP integration in Eaton. With your dedication, the project go-live on time, and no major issue in the first two weeks of go-live. Thanks again. Eric."

- Eric Huang on July 7, 2019: "Thanks for your good support during CRP2 and UAT to resolve issues/defects quickly for this very complex integration project, and we can get UAT approval from business. Let's work together to complete cutover over activities and data migration for our go-live on 29th July."

- Kyle Kim on June 4, 2019: "Thank you for your hard work implementing Enovia and make the life cycle management for ELX more efficient."

- Jerom Van Santen on June 3, 2019: "Thanks Davis for providing support and guidance during the extended warrantee period after ICPD [and] PDD went Live with Enovia for 415+ users. We handled 140 tickets in total with 6 complex ones assigned to you."

- Suhasini Vhatkar on May 22, 2019: "Hi Lu, I would like to take this opportunity to say you thank you for helping me in creating ECO to obsolete the parts. It is always a great experience working with you. This is not only case you always supported us. Keep doing great work!!! Thanks again. Best Regards, Suhasini"

- Ender Duran on May 14, 2019: "Hi Davis, I wanted to thank you for your great effort in preparing Enovia data extraction for the project 51327. It was really a strong start and you contributed the project a lot. Thanks again. Regards, Ender"

- Kelly Donlin on April 28, 2019: "Thank you very much for being an integral part of the Coamo [and] Haina ICD IT Functional project team, As a team, we were able to successfully deliver the solution into the new production environment by working through new technical challenges, issue analysis, and upgrade modifications. We could not have done this without collaboration and your relentless support, tireless energy, skills, and experience! Thank You - Kelly Donlin"

- Miroslav Brtva on March 27, 2019: "Davis, I would like to thank you as your help was really needed. You were able to make the progress with all developments and issues for our project. Always great to work with you! Looking forward for next time!"

### III.    THE OFFENSE CONDUCT

The Court is well-versed on the alleged facts of this case, and Mr. Lu will not repeat them here. Mr. Lu has, throughout this investigation and trial, acknowledged having written the code the government alleged caused the Eaton servers to repeatedly crash. He maintains that the program had a legitimate purpose and denies any malicious intent in creating the code. He also denies that his code was the cause of the server crashes. Nevertheless, he understands and respects that the jury concluded otherwise.

### IV.    THE GUIDELINES ARE ADVISORY, AND THE SENTENCE SHOULD BE NO GREATER THAN NECESSARY TO SATISFY THE STATUTORY PURPOSES UNDER § 3553(a).

At the outset of sentencing, the Court must determine the applicable Sentencing Guidelines range. *See Molina-Martinez v. United States*, 136 S. Ct. 1338, 1342 (2016). Although the Guidelines were once mandatory, following *United States v. Booker*, 543 U.S. 220 (2005), the Guidelines no longer carry the force of law, federal judges are no longer bound to strictly apply them, and "[a] district court may not presume that a Guidelines sentence is reasonable." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). The Guidelines are now purely advisory, and the Court has significant discretion to vary from the Guideline range. *See id.* at 187–88. Instead of applying the Guidelines as compulsory, the Court has discretion to impose a non-Guideline sentence as long as the sentence is reasonable and justified. *See United States v. Jimenez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006) (en banc) ("*Booker*'s remedial solution makes it possible for courts to impose non-guideline sentences that override the guidelines, subject only to the

---

-    Jerome Van Santen on March 26, 2019: "Davis, We went Live yesterday after a journey of nearly 2 years. I'd like to thank you for your contribution. During most of 2018, you developed many new functionalities essential to our project and also improved existing OOTB Enovia pgms. You have been a real asset in my team and I owe you a lot. Hope to work again with you on other adventures!"

4

ultimate requirement of reasonableness."), *abrogated on other grounds by Rita v. United States*, 551 U.S. 338 (2007); *see also Koon v. United States*, 518 U.S. 81, 96–97 (1996) (determining that a district court is vested with broad discretion to depart from the Guidelines); U.S.S.G § 5K2.0 (2018).

The Guidelines are now but a "starting point and initial benchmark" for sentencing. *Gall v. United States*, 552 U.S. 38, 39 (2007). After calculating the Guidelines range, the Court must then "make an individualized assessment based on the facts presented" by the parties. *Id.* Post-*Booker* sentencing involves two steps—after the first step of calculating the Guideline range—the Court must then engage in the second step of considering the § 3553(a) factors to determine a reasonable sentence. *See United States v. Talley*, 431 F.3d 784, 786 (11th Cir. 2005), *abrogated on other grounds by Rita*, 551 U.S. at 338; *United States v. Hung*, 459 F.3d 1180, 1185 (11th Cir. 2006). Just as the Court has discretion to impose a non-Guidelines sentence, "the weight to be afforded any § 3553(a) factor is a matter firmly committed to the discretion of the sentencing judge." *United States v. Verkhoglyad*, 516 F.3d 122, 131 (2d Cir. 2008) (quotation marks omitted). Furthermore, the Court has discretion to decide whether any § 3553(a) factor justifies a downward variance. *See Gall*, 552 U.S. at 51. When imposing a sentence outside the Guidelines range, the Court applies a non-mathematical formula with individualized assessments based on facts presented by the parties. *Id.* at 47, 50.

This Court must be guided by the fact that the ultimate sentence should be "not greater than necessary to accomplish the sentencing goals advanced in § 3553(a)." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

**V.      THE GUIDELINES OVERSTATE THE SERIOUSNESS OF THE OFFENSE AND A DOWNWARD VARIANCE/DEPARTURE IS WARRANTED.**

The base offense guidelines for 18 U.S.C. § 1030(a)(5) is level 6, which would result in a guidelines sentence of 0-6 months. But Mr. Lu's guidelines are, according to the Pre-Sentence Report, level 26, which provide a guideline sentence of *63-78 months*. This canyon-wide delta between the base offense level and Mr. Lu's current calculation is primarily the result of the interplay with the statute of conviction and the sentencing guidelines, which are an exceedingly poor fit when determining a fair and just sentence for a violation of 18 U.S.C. 1030(a)(5). As a result, Mr. Lu's sentencing guidelines are multiplied by over four hundred percent and his guideline sentence far exceeds what would be just and fair.

**A.      <u>The Sophisticated Means and Special Skills Enhancements should not apply, and even if one enhancement is deemed applicable, then the second enhancement should not apply.</u>**

Mr. Lu's guideline calculation is artificially inflated by multiple instances of double-counting. First, the guidelines adds two levels for sophisticated means, pursuant to U.S.S.G. § 2B1.1(b)(10)(C) because Mr. Lu "used sophisticated means when he created malicious code to cause the servers at Eaton Corporation to crash." The Sentencing Guidelines define "sophisticated means" as:

> especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

U.S.S.G. § 2B1.1(b)(10)(C), comment. (n.9(B)).

But here, unlike, for example, telemarketing fraud—which is not inherently complex or sophisticated—the offense of creating and sending a self-destructive computer code is inherently

6

sophisticated, and requires training and expertise far beyond the normal criminal offense. It beggars the imagination how someone who did not employ sophisticated means could create and send a code that could damage computer servers. Indeed, creating computer code in and of itself is beyond the ability of anyone without specific training and education.

Then, there is an additional two-level enhancement for "use of a special skill," pursuant to U.S.S.G. § 3B1.3. "Special skill refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts." U.S.S.G. § 3B1.3, comment. (n.4). This enhancement purportedly applies because Mr. Lu's special skill was that of a computer programmer. But only a computer programmer would be able to commit a violation of 18 U.S.C. § 1030(a)(5)(A) which, by definition, requires the creation of a computer code.[2]

Other commentators have noted that the sophisticated means and special skill enhancements, while commonly sought in computer fraud cases, "are hard to justify" when applied to 18 U.S.C. § 1030(a). *See* Orin Kerr, *Trespass, Not Fraud: the Need for New Sentencing Guidelines in CFAA Cases*, George Washington Law Review, Dec. 2016, Vol. 84, No. 6, 1561–63. Kerr notes that the violations of 18 U.S.C. § 1030(a)(2)–(5) are much more akin to typical

---

[2] The PSR also maintains that a two-level enhancement would, in the alternative, be appropriate because Mr. Lu "abused a position of trust." PSR ¶ 27. This finding is meritless. As Mr. Lu explained in his Supplemental Objections to the Draft PSR, the Sentencing Guidelines define a position of private trust as being "characterized by professional or managerial discretion." U.S.S.G. § 3B1.3, comment. (n.1). This means "substantial discretionary judgment that is ordinarily given considerable deference." *Id.* The Sixth Circuit has explained that abuse of trust must involve a fiduciary-like relationship between the defendant and victim, and does not apply where an employee simply violates his employer's trust by violating the law and thereby harming the employer. *See United States v. Tatum*, 518 F.3d 369, 373 (6th Cir. 2008). For this reason, and those outlined in more detail in Mr. Lu's objections to the PSR, the two-level enhancement for abuse of position of trust is not warranted. *See* Exs. 1, 2.

trespass violations, rather than financial fraud, and therefore the fraud-loss guidelines are a poor

fit. *Id.* at 1554–56. And the sophisticated means and special skill enhancements are also unfairly

applied to many of these violations:

> The sophisticated means enhancement makes sense in fraud cases but has no obvious justification in trespass cases. In a fraud case, a defendant who goes to great lengths to keep the fraud hidden can commit a wider-scale offense. Most CFAA prosecutions, however, involve trespass rather than fraud. It is less clear why concealing a trespass makes it more culpable or worthy of deterrence. To the extent the difficulty of investigating CFAA crimes should be a ground for extra punishment, it is likely already accounted for by the victim-loss consideration in the section 2B1.1 loss chart. Difficulty catching a criminal will generally mean more time investigating the offense. Under section 2B1.1, that already translates into higher economic losses and a greater punishment.
>
> Similarly, it is unclear why CFAA defendants should be punished more for using computer expertise under the special skills enhancement. Committing a CFAA offense often requires expertise. It seems odd to punish defendants for committing the crime and then to punish them more for having the expertise needed to commit it. More broadly, even if some computer skills are "special," they do not seem special in the way ordinarily recognized in section 3B1.3. The purpose of section 3B1.3 is to recognize the special harms when defendants take advantage of society's trust in certain professions and positions to give them less oversight. The possession of special skills means less oversight by others and more trust; the abuse of those skills is an abuse of that trust. That rationale has little application to computer skills. Society does not normally trust people who know how to hack into computers. People who develop those skills generally do so on their own, not with the blessing of, or a special license from, the public.

*Id.* at 1563–64.

**B.**     **The other enhancements result in additional double-counting or otherwise overstate the seriousness of the offense.**

**1.**     **The application of an enhancement for a violation of 18 U.S.C. § 1030(a)(5)(A) results in double-counting.**

In addition to the sophisticated means and special skills enhancements, Mr. Lu's guidelines

are enhanced another four levels because Mr. Lu "was convicted of an offense under 18 U.S.C. §

1030(a)(5)(A)." In other words, even though the Sentencing Guidelines indicate that the base

offense level for 18 U.S.C. § 1030(a)(5)(A) is level 6, the specific offense characteristic—which,

8

by definition would apply to *every* violation of 18 U.S.C. § 1030(a)(5)(A)—increases the base offense from a level 6 to a level 10. Double-counting occurs where "a single aspect of the defendant's conduct both determines *his offense level and triggers an enhancement*." *United States v. Eversole*, 487 F.3d 1024, 1030 (6th Cir. 2007) (internal citations and quotations omitted) (emphasis added). Such is the case here.

### 2. The Sophisticated Means and Obstruction of Justice Enhancements improperly rely on the same conduct, resulting in double-counting.

And that is not all. Mr. Lu's guidelines are increased yet another two levels for obstruction of justice because Mr. Lu "deleted encrypted files and wiped them from the laptop computer using a tool called Cipher." PSR ¶ 28. The PSR then relies upon this same conduct to enhance Mr. Lu's offense level because it also constitutes evidence of "sophisticated means." It is clearly double-counting when the same conduct that gives rise to the sophisticated means enhancement provides the same basis for the obstruction of justice enhancement.

### 3. The government has not satisfied its burden to prove its requested 12-level increase for loss amount, which also overstates the seriousness of the offense.

Mr. Lu's guidelines calculation is enhanced an additional 12 levels because the amount of loss sustained by Eaton Corporation was allegedly more than $250,000. It is the government's burden to establish actual loss, and applying an enhancement where it has not done so is improper. *United States v. Schneider*, 930 F.2d 555, 559 (7th Cir. 1991) (declining to apply loss enhancement where government "failed—failed utterly to prove any loss to the victim"); *United States v. Yu Xue*, No. CR 16-22, 2020 WL 5645765, at *17 (E.D. Pa. Sept. 22, 2020), *aff'd sub nom. United States v. Xue*, 42 F.4th 355 (3d Cir. 2022) (finding no loss enhancement warranted where government failed to meet its burden). Here, the PSR simply asserts—without citing any evidentiary support—that Eaton suffered $365,838.00 in loss for its costs in addressing the

computer server issues allegedly caused by Mr. Lu. This figure is unsupported by evidence. The government has not documented how many Eaton employees worked, for how many hours, and how much these workers were compensated on an hourly basis.  To apply a 12-level enhancement on this dearth of evidence would be error.[3]

Moreover, the § 2B1.1 fraud-loss table is an exceedingly poor fit in determining a fair and just sentence, particularly in cases involving § 1030(a)(5)(A) cases, which are more akin to trespass rather than fraud cases. Courts have increasingly recognized that, "unless applied with great care," the loss guidelines "can lead to unreasonable sentences that are inconsistent with what § 3553 requires," and thus may require a significant downward variance. *United States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013) (Underhill, J., concurring). As Judge Rakoff has explained, strict adherence to the guidelines can result in an "utter travesty of justice . . . from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense." *United States v. Adelson*, 441 F. Supp. 2d. 506, 512 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008). That principle applies with particular force in this case, where Mr. Lu's offense level is increased by more than 400 percent.

Courts are to consider a downward variance in cases where, as here, the enhancements dwarf the base offense level, distorting the resulting Guidelines range and overwhelming the § 3553 factors. In *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016), the Second Circuit questioned the wisdom of the fraud loss guidelines for this very reason. Judge Newman acknowledged that the district court's loss-related "increases complied with the Guidelines

---

[3] The only "evidence" in the record about the amount of loss came from Matt Rose, who testified only that Eaton suffered a loss of "easily $100,000. Certainly hundreds of thousands of dollars is certainly likely." Tr. 1499. There was no indication that Mr. Rose relied on any analysis to support what was clearly a guesstimate. .

Manual," and that "the Commission had the authority to construct a set of guidelines that used loss amount as the predominant determination of the adjusted offense level for monetary offenses." *Id.* But Judge Newman cautioned that, while "[t]his approach, unknown to other sentencing systems, was one the Commission was entitled to take, . . . its unusualness is a circumstance that a sentencing court is entitled to consider." *Id.* The district court in *Algahaim* had increased one defendant's adjusted offense level from a base of 6 to 18, based on the loss amount, which the court observed was a "three-fold increase," and had increased the second defendant's adjusted offense level from a base of 6 to 16, based on the loss amount. *Id.* Noting the sharp increase due to the fraud loss guidelines, the Second Circuit remanded for resentencing, concluding that "[w]here the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence." *Id.*

Part of the problem with the fraud-loss guidelines is that the way in which they were developed renders them "fundamentally flawed, especially as loss amounts climb." *Corsey*, 723 F.3d at 380 (Underhill, J., concurring); *United States v. Johnson*, 16-CR-457-1 (NGG), 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018). Specifically, the fraud-loss table, unlike certain other sections of the Guidelines, "was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices." *Corsey*, 723 F.3d at 379; *accord Johnson*, 2018 WL 1997975, at *3. As Judge Underhill explained:

> The history of bracket inflation directed by Congress renders the loss guideline fundamentally flawed, especially as loss amounts climb. The higher the loss amount, the more distorted is the guideline's advice to sentencing judges. As a well-known sentencing commentator has put it, "For the small class of defendants … convicted for fraud offenses associated with very large guidelines loss calculations, the guidelines now are divorced both from the objectives of Section 3553(a) and, frankly, from common sense. Accordingly, the guidelines calculations in such cases are of diminished value to sentencing judges."

11

*Corsey*, 723 F.3d at 380 (quoting Frank O. Bowman, III, *Sentencing High-Loss Corporate Insider Frauds After* Booker, 20 Fed. Sent'g. Rep. 167, 168 (2008)).

This is why courts have increasingly found that the fraud loss guidelines result in unreasonable sentencing ranges in cases where, like here, the PSR has found a substantial loss amount. *See Johnson*, 2018 WL 1997975, at *3 (departing downward in a financial fraud case from 87–108 months to a non-guidelines sentence of 24 months and observing that, "because the loss Guideline was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices … district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice that guideline provides" (internal quotation marks omitted)); *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) ("By making a Guidelines sentence turn, for all practical purposes, on [loss enhancement], the Sentencing Commission . . . effectively guaranteed that many such sentences would be irrational on their face."), *aff'd*, 747 F.3d 111 (2d Cir. 2014); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2014) (noting that the Guidelines place "undue" and "excessive" weight" on the loss amount) (Lynch, J.); *United States v. Ranum*, 353 F. Supp. 2d 984, 990 (E.D. Wis. 2005) ("One of the primary limitations of the guidelines, particularly in white-collar cases, is their mechanical correlation between loss and offense level.").

## C.      If the Court finds that the guidelines are level 26, then it should depart or vary downwards on the basis that this offense level overstates the seriousness of this offense.

Mr. Lu is not arguing that this offense was not serious, but rather that the guidelines are an exceedingly poor fit in gauging a just and reasonable sentence for this particular violation. The Court should thus depart or vary downward because this calculation markedly overstates the seriousness of the offense. As is far too often the case, the Guidelines calculations proposed by the

12

PSR would result in a guidelines sentence that is excessive. Therefore, if the Court were to accept the guideline range proposed, a downward departure under the Guidelines would be warranted. *See* U.S.S.G. § 2B1.1, comment. (n.21(C)) ("There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted.").

A sentence of 18 months incarceration would satisfy the Court's obligation to impose a sentence that is "sufficient, but not greater than necessary to accomplish the goals of sentencing," *Kimbrough*, 552 U.S. at 101 (internal quotations omitted).

    1.    **A sentence of eighteen months would b**e "**sufficient, but not greater than necessary, to comply with the statutory purposes of sentencing."**

In arriving at a just and reasonable sentence, the Court must consider all of the circumstances of the conduct and "make an individualized assessment" of the defendant. *Gall*, 552 U.S. at 39. Mr. Lu is now a convicted felon. He has lost his job as well as any prospect of future employment in his field. Because Mr. Lu has been the primary breadwinner in his family, the loss of income has been devastating financially. Mr. Lu's wife has been forced to sell the family home to raise funds for Mr. Lu's legal defense as well as to have money to support herself. Mr. Lu is a legal resident, not a United States citizen; as a result of this conviction, he will be unable to safely leave the United States as he will almost certainly not be permitted to reenter the country. This means he will almost certainly never be able to see his elderly father, who is unable to travel, again.

Since his conviction on March 7, Mr. Lu has been detained at the Northeast Ohio Correctional Center in Youngstown, Ohio. This facility has a long history of inmate violence, with multiple and frequent stabbings. The conditions under which Mr. Lu has been detained the past five and one-half months have been exceptionally harsh. He shares an eight foot by four foot cell with a roommate. He is permitted to see the outdoors for only one hour, once or twice per week.

All of his remaining time is indoors with no windows or access to fresh air. There are lockdowns three times per day, each lasting two to three hours at a time, and then 12 hours at night.[4] There is limited food and Mr. Lu is constantly hungry. Mr. Lu is housed with state and county prisoners, many of whom are being detained for violent felonies. As a consequence, Mr. Lu is in constant fear for his safety, as some inmates have made knives, and there have been multiple violent assaults at the facility.

Mr. Lu is far older than most inmates in the detention facility. He has a slight build and is completely unequipped to defend himself if he is threatened. As such, he has been living in a perpetual state of anxiety and fear for the past nearly six months.

In short, the nearly six months Mr. Lu has already spent incarcerated has been far more punitive than a similar sentence at a Bureau of Prisons facility that has opportunities for work and recreation. The time Mr. Lu has spent in these harsh conditions is a factor that the Court should consider in weighing the amount of additional prison time that it deems warranted.

It is beyond dispute that the life that Mr. Lu built for himself and his family over the past 25 years is over. It lies in tatters. All of these collateral consequences resulting from of Mr. Lu's conviction are appropriate for the Court to consider when determining what constitutes a "reasonable" sentence.

> **2.** **An 18-month sentence is sufficient because Mr. Lu poses no threat to the public (§ 3553(a)(2)(C)).**

With the exception of the present criminal proceeding, Mr. Lu has never been accused of wrongdoing. As such, nothing in his past suggests any criminal tendencies. As a result of his conviction, Mr. Lu will not be able to work in his chosen profession and thus is exceedingly

---

[4] There was also a three-day lockdown after two inmates were found fighting over an apple, and a two and one-half day lockdown due to a power outage.

unlikely to reoffend. *See U.S. v. Carmona-Rodriguez*, No. 04-CR-667(RWS), 2005 WL 840464, at *4 (S.D.N.Y. Apr. 11, 2005) (noting defendants "over the age of forty . . . exhibit markedly lower rates of recidivism). There is, therefore, an extremely minimal risk of recidivism. Thus, this factor does not support a custodial sentence within the Guidelines range.

### 3. Mr. Lu requires no correctional treatment (§ 3553(a)(2)(D)).

Mr. Lu does not require any educational or vocational training, medical care, or other correctional treatment that would warrant a custodial sentence within the Guidelines range.

### 4. A guidelines sentence of between 63-78 months would be far in excess of other defendants convicted for the same offense, and would create unwarranted sentencing disparities for similarly situated defendants.

A sentencing Court should "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. . . .." 18 U.S.C. § 3553(a)(6). Were the Court to follow the the government's recommendation that it sentence Mr. Lu at the high-end of the guidelines—or 78 months—it would be a longer sentence than virtually any defendant ever sentenced for a violation of 18 U.S.C. § 1030(a)(5)(A). A defense survey of all defendants convicted of 18 U.S.C. § 1030(a)(5)(A) for which relevant information was available makes clear that a sentence of that length would be far in excess to other, similarly situated defendants. Indeed, such a sentence would be years longer than comparable cases. For example:

- *United States v. Stafford*, No. 17-CR-380 (D. Md. 2017): After being fired, defendant used his knowledge of his former companies' systems to access and delete entire file systems; although his sentencing guidelines were 21-27 months, defendant received a sentence of **1 year and one day**.

- *United States v. Sullivan*, No. 3:99-cr-00122 (W.D. N.C. 1999): Defendant intentionally inserted a "logic bomb" (computer code) into his employer's software; four months after he quit he deployed the "logic bomb" which disabled over 800 computers used by the companies representatives; restitution of $194,000 ordered; defendant sentenced to **24 months.**

- *United States v. Lanam*, No. 06-CR-20136 (E.D. Mich. 2006): Defendant gained unauthorized access to the companies computer systems, disabled a firewall, and

15

overwhelmed the company's telephone system with "ping flood" commands; sentenced to **21 months.**

- *United States v. Golightley*, No. 6:18-CR-10097 (D. Kan. 2018): Defendant convicted for intentionally causing damage to protected computers by launching multiple distributed-denial-of-service ("DDoS") attacks against Nex-Tech's websites and systems, resulting in significant operational disruption and financial loss; sentenced to **27 months**.

- *United States v. Llyod*, No. 98-CR-61 (D.N.J. 1998): Defendant convicted for installing and transmitting a destructive computer program to his former employer's computer systems; defendant intentionally used the program to delete the programs and data the company used to manufacturer specialized products; despite causing a loss of over $2 million, defendant sentenced to **41 months**.

- *United States v. Fowler*, No. 8:10–cr–00065 (M.D. Fla. 2010): Defendant convicted for intentionally causing damage to protected computers by changing the password to the company's firewall, as well as disabling all administrator accounts and disconnecting servers, thereby depriving health care administrators form being able to communicate internally which disrupted operations; sentenced to **18 months**.

- *United States v. Shahulhameed*, No. 5:12-CR-00118 (E.D. Ky. 2012): After being fired from his IT contracting position, defendant intentionally launched a cyberattack against Toyota Motors, rendering several servers inoperable; despite guidelines of 63-78 months, sentenced to **48 months**.

- *United States v. Drew*, No. 00-CR-39 (E.D. Va. 2000): Defendant caused the transmission of a program, information, or code, without authorization by using "email bomb" program to flood employer's computer system with millions of emails; sentenced to **15 months.**

- *United States v. Goodyear* No. CR-17-179-HE (W.D. Okla. 2017): Defendant directed DDoS cyber attack on two websites owned by family-owned telescope retailer; despite guidelines of 78-97 months, defendant sentenced to **26 months.**

- *United States v. Pok Seong Kwong*, No. 4:05-CR-00001 (E.D. Tex. 2005): Defendant installed harmful programs into employer's computer system after alleging employer engaged in race discrimination; despite a loss of over $700,000 and a commensurate guideline enhancement of 14 levels, received a sentence of **51 months**.

- *United States v. Phillips*, No. 1:04-CR-247-ALL (W.D. Tex. 2004): Defendant implemented various programs designed to scan computer networks and steal encrypted data and passwords, including personal and proprietary data, from students, companies, US Government agencies, and the British Armed Services; sentenced to **60 months' probation.**

- *United States v. Thomas*, No. 4:13-CR-227-1 (E.D. Tex. 2013): Defendant "tinker[ed]" with employer's computer system in retaliation for employer's decision to terminate

16

defendant's close friend, which was "mostly harmless" despite defendant's *ability* to cause up to $50 million in harm through more destructive means; despite guideline calculation of 41-51 months, sentenced to **time served.**

- *United States v. Carlson*, No. 03-CR-641 (E.D. Pa. 2003): Defendant launched hundreds of thousands of spam emails, spoofing the return addresses to make it appear that someone else had sent the message; **sentenced to 48 months.**

- *United States v. Shea*, No. 03-CR-20057 (N.D. Cal. 2003): Defendant working at debt collection services activated a program that corrupted approximately 50,000 entries, replacing debt principal amounts with random numbers, switching client ID numbers, and eliminating SSN numbers, in apparent retaliation for employer's denial of defendant's request to work from home to care for daughter with diabetes and ultimately firing defendant (employer cited poor performance for both actions); sentenced to **one year and one day.**

- *United States v. Schuster*, No. 04-CR-175 (W.D. Wisc. 2004): Defendant was terminated and in presumptive retaliation improperly accessed former employer's internet network by using internet access information of various customers, disrupting the former employer's wireless internet connection, negatively impacting business operations; defendant sentenced to **15 months**.

- *United States v. Lanam*, No. 06-CR-20136 (E.D. Mich. 2006): Defendant implemented a cyber-attack on former employer's computer network, disrupting the company's telephone system and disabling its firewall, in apparent retaliation for the former employer ended its employment relationship with defendant; defendant sentence to **21 months.**

- *United States v. Perry*, No. 03-CR-329 (D.D.C. 2003): Defendant convicted of damaging an EPA computer that he accessed without authorization, which shut down the EPA's server and deleted printer objects; sentenced to **four months.**

This survey, going back more than 25 years, makes clear that the government's recommendation, if followed, would be years longer than any comparable case.[5]

---

[5] The only case the defense could find where a defendant was sentenced for longer than the 78 months the government is recommending for Mr. Lu is *United States v. Bondars*, 1:16-CR-228 (E.D. Va. 2016), a case in no way comparable to that of Mr. Lu's. Bondars and a co-defendant were indicted for Conspiracy to Commit Wire Fraud in addition to 18 U.S.C. § 1030(a)(5)(A). The defendants "made a business out of helping computer hackers" and "hijacked the services of every major antivirus company and provided those services to the hackers themselves." Dkt. No. 207. The defendants hacking tool " infected **33 million computers** . . . [and was] used in one of the largest data breaches in U.S. history—the Target data breach that compromised over **39 million credit and debit cards."** *Id.* The defendants were found to be responsible for a loss of over $550

17

**D.      The Government's Recommendation Would Constitute an Impermissible Trial Penalty.**

The government is now recommending a guidelines sentence of between 63 and 78 months. Prior to trial, however, the government had advised prior counsel that, in exchange for a plea, the government was willing to recommend a non-custodial sentence. The glaring gap between a non-custodial sentence and the government's current recommendation that Mr. Lu receive six and one-half years in prison can only be attributed to an improper trial penalty. While some disparity in sentence between a defendant who goes to trial and one who chooses to plead guilty is not necessarily inherently unreasonable, the glaring delta between a non-custodial sentence and nearly six years of incarceration should not be countenanced. Mr. Lu's alleged conduct, and the harm it caused Eaton, was well known to the government at the time it made its plea offer. If a disposition involving no prison was deemed appropriate before trial, then it is inappropriate—and arguably unconstitutional—for the government to argue that a guidelines sentence of nearly six years in prison is just and proper now, post-trial. That Mr. Lu chose to challenge the accusations made against was an exercise of his constitutional rights. The Court should not now ignore the government's pre-trial view of what would be an appropriate sentence.

Other courts have found that Section 3E1.1(b) of the United States sentencing guidelines is unconstitutional because it imposes a trial penalty on defendants who choose to go to trial. *See United States v. Tavberidze*, 769 F. Supp. 3d 264, 272-73 (S.D.N.Y. 2025) (Rakoff, J.). *But see United States v. Gray*, 641 F. App'x 462, 469 (6th Cir. 2016). In *Tavberidze*, Judge Rakoff found that Section 3E1.1(b) violated the Sixth Amendment right to trial because it subjected "a defendant to a heightened Guidelines range based solely on his decision to proceed to trial[.]" *Id.* at 271.

---

million, and had an offense level of 51, with an attendant guidelines range of 420 months. *Id.* at 20. Small wonder the defendant received a combined sentence of 168 months. Nothing about this case is remotely similar to that of Mr. Lu's.

18

Even though the Guidelines are no longer mandatory, "in practice, a district judge may . . . unintentionally [enforce Section 3E1.1's trial penalty] by imposing a sentence within a defendant's heightened Guidelines range." *Id.* at 272. Although Judge Rakoff did not reach the question of whether Section 3E1.1(a) was also an unconstitutional trial penalty, he nevertheless treated the defendant "as having the equivalent of a Guidelines range three points less than what the formal Guidelines calculation would otherwise mandate," effectively applying the full three-point deduction for acceptance of responsibility. *Id.* at 273; *see* also § 3E1.1(a) (two-point deduction for acceptance of responsibility); § 3E1.1(b) (additional one-point deduction for "permitting the government to avoid preparing for trial").

At least one other court has expressed concern in how Section 3E1.1 "effectively acts as a trial penalty." *See United States v. Abraham*, 498 F. Supp. 3d 175, 183 (D. Mass. 2020), *aff'd,* 63 F.4th 102 (1st Cir. 2023). In *Abraham*, the court varied downward to sentence the defendant within the Guidelines range that represented a three-level deduction, despite that the defendant proceeded to trial. 498 F. Supp. 3d at 185. The court noted:

> [T]hose who exercise their constitutional right to a trial before a jury of their peers suffer a more severe penalty than those who cop a plea, ostensibly because we wish to provide leniency to those others who 'accept responsibility,' but really because they have inconvenienced the government by forcing it to undergo the expense and uncertainty of a trial. Significant scholarship confirms these concerns are not merely theoretical. A recent statistical analysis of federal sentences looked at 207,352 federal criminal convictions from 2006-2008 available in a database maintained by the United States Sentencing Commission to examine whether defendants suffered a penalty for going to trial, and if so, its extent. The study found that, after controlling for the two-to-three point reduction provided by section 3E1.1, defendants convicted at trial received a sixty-four percent longer sentence than similar defendants who pled guilty to similar crimes. . . . Recent data also indicates that a mere three percent of defendants go to trial. In practice, this means that the section 3E1.1 reduction is the norm in all but a small subset of cases because it is applied almost automatically. . . . As a result, approximately ninety-six percent of sentenced defendants received either the two- or three-levels off their guidelines calculation for "acceptance."

*Id.* 183–85 (internal citations omitted). In *Abraham*, had the defendant "pled guilty, his

guideline range would have been 210-262 months . . . . **Solely because he went to trial, however** – a jury trial guaranteed by Article III of the United States Constitution – the recommended sentencing range is 292-365 months." *Id.* at 185 (emphasis in original). Finding that the "strikingly disparate sentencing ranges (which do not even come close to overlapping)" did not "square with the statutory mandate – 'sufficient, but **not greater than necessary**,'" particularly where the "Commission counsels the huge bulk of similarly situated defendants ought be sentenced within the lower range," the court departed downward. *Id.*

This Court need not find that Section 3E1.1(a) is unconstitutional to still find that the imposition of a guidelines sentence of more than six years is unreasonable where the government, prior to trial, was prepared to recommend a non-custodial sentence.

## VI. TO THE EXTENT THE COURT FINDS ACTUAL LOSS, THE ORDER FOR RESTITUTION SHOULD RECOGNIZE THAT MR. LU HAS NO INCOME AND NO SIGNIFICANT SAVINGS.

It is the government's burden to establish actual loss by a preponderance of the evidence, 18 U.S.C. § 3664(e), and that evidence "must have 'sufficient indicia of reliability to support its probable accuracy.' " *United States v. Higgins*, No. 22-3538, 2023 WL 6536752, at *12 (6th Cir. Oct. 6, 2023) (quoting United States v. Sawyer, 825 F.3d 287, 294–95 (6th Cir. 2016)). To order restitution absent this showing would be error. *See United States v. Sellers*, No. 3:23 MJ 8002, 2024 WL 3771810, at *3 (N.D. Ohio Aug. 13, 2024) (affirming denial of restitution where government failed to prove actual loss by preponderance of the evidence). As set forth above, the government has not satisfied this burden.

To the extent the Court finds the government has satisfied its burden, any order for restitution should recognize Mr. Lu's lack of resources and inability to pay. Mr. Lu has been detained since his conviction on March 7. He has not worked since that time and neither he nor his family has any source of income. Indeed, the PSR reflects that Mr. Lu's family has a net negative

20

cash flow each month. PSR ¶ 62. Given this, Mr. Lu requests that no order of restitution be required until Mr. Lu is released from custody and has a means of employment. At that point, the restitution order should a nominal amount each month, until Mr. Lu is in a position to make more substantial payments. *See* 18 U.S.C. § 3664(f)(2)(A)–(C), (f)(3)(A)–(B) (emphasis added):

> (2)  Upon determination of the amount of restitution owed to each victim, the court shall, pursuant to section 3572, specify in the restitution order the manner in which, and the schedule according to which, the restitution is to be paid, **in consideration of—**
>
> > **(A)  the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled**;
> >
> > **(B)  projected earnings and other income of the defendant; and**
> >
> > **(C)  any financial obligations of the defendant; including obligations to dependents.**
>
> (3)
>
> > **(A)**  A restitution order may direct the defendant to make a single, lump-sum payment, partial payments at specified intervals, in-kind payments, or a combination of payments at specified intervals and in-kind payments.
> >
> > **(B)  A restitution order may direct the defendant to make nominal periodic payments if the court finds from facts on the record that the economic circumstances of the defendant do not allow the payment of any amount of a restitution order, and do not allow for the payment of the full amount of a restitution order in the foreseeable future under any reasonable schedule of payments.**

Given the dire economic circumstances now confronting Mr. Lu, he will be unable to make any payments in support of a restitution amount for the foreseeable future. If and when those circumstances change, any order of restitution can, of course, be revisited and adjusted.

## VII.    CONCLUSION

Weighing all the equities outlined above, and being mindful of the strictures of 18 U.S.C. § 3553 to impose a sentence, a sentence of eighteen months is fair and just. Such a sentence is

significant and, in combination with the myriad of consequences that Mr. Lu will now have to confront, a just and fair sentence.

The life Mr. Lu knew prior to his arrest is over, forever. He is now a felon—a label that he will be forced to wear for the rest of his life. His once-promising career is over. As a result of his conduct, his family's finances have been devastated. A custodial sentence of 18 months would accomplish the goals of sentencing set forth in 18 U.S.C. § 3553.

Dated: August 14, 2025                              Respectfully submitted,

                                                     */s/ Peter Zeidenberg*
                                                     Peter Zeidenberg
                                                     ArentFox Schiff LLP
                                                     1717 K Street, NW
                                                     Washington, DC 20006-5344
                                                     Phone: 202.857.6139
                                                     Fax: 202.857.6395
                                                     Email: peter.zeidenberg@afslaw.com

                                                     *Counsel to Defendant Davis Lu*

22

## CERTIFICATE OF SERVICE

I certify that on August 14, 2025, a true and correct copy of the foregoing was served by the Court's CM/ECF system on all counsel of record.


          */s/ Peter Zeidenberg*
          Peter Zeidenberg